IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SIGNAL HILL CAPITAL GROUP LLC | : | |
| | : | |
| v. | : | Civil No. CCB-13-3352 |
| | : | |
| CMO INTERNATIONAL ApS | : | |
| | : | |

## MEMORANDUM

Plaintiff Signal Hill Capital Group LLC ("Signal Hill") filed this action against CMO International ApS ("CMO") seeking damages for breach of contract. (Compl., ECF No. 1.) CMO filed a counterclaim against Signal Hill seeking damages for negligent misrepresentation and breach of fiduciary duty. (Countercompl., ECF No. 12.) Signal Hill's motion to dismiss CMO's counterclaims and for judgment on the pleadings is now pending before the court. (ECF No. 13.) The parties have fully briefed the issues, and no hearing is necessary. *See* Local Rule 105.6. For the reasons set forth below, the motion to dismiss will be granted and the motion for judgment on the pleadings will be denied.

## BACKGROUND

CMO is a limited liability company incorporated in Denmark. (Countercompl. ¶ 1.) On November 19, 2012, it entered into a contract ("the Agreement") with Signal Hill under which Signal Hill was to provide various financial advisory and investment banking services to CMO related to a possible transaction through "sale, merger, joint venture or otherwise . . . in which 40% or more of the voting power of [CMO] or all or a substantial portion of its business or assets are combined with or transferred to another company." (Countercompl. ¶ 5; Agreement, Compl.

1

Ex. A, ECF No. 1-2, at 1.)  Specifically, the Agreement required Signal Hill to:

(a) "familiarize itself to the extent it deems appropriate and feasible with the business, operations, financial condition and prospects" of CMO;
(b) "assist [CMO] in identifying and evaluating candidates for a potential Transaction;"
(c) "in coordination with [CMO], . . . prepare and implement a marketing plan and . . . memorandum describing [CMO] (the 'Selling Memo') for distribution to potential parties to a Transaction;"
(d) "contact potential candidates which Signal Hill and [CMO] have agreed may be appropriate for a potential Transaction" and meet with and provide such candidates with information about CMO "as may be appropriate and acceptable to [CMO];"
(e) "advise and assist [CMO] in considering the desirability of effecting a Transaction, and . . . in developing and implementing a general strategy for accomplishing a Transaction;"
(f) "advise and assist senior management of [CMO] in making presentations to the Board of Directors of [CMO] concerning any proposed Transaction;" and
(g) "advise and assist [CMO] in the course of its negotiation of a Transaction and . . . participate in such negotiations as requested."

(Agreement § 1.)  In addition, CMO claims Signal Hill's representatives made representations prior to when CMO signed the Agreement about the services it would provide.  Specifically, according to CMO, Signal Hill represented that it would have a purchaser quickly, that there would be a three to four month structured process to sell the business to a buyer who would purchase 100 percent of it, that it would be a simple process lasting six months, at most, and that Signal Hill had connections with a significant number of potential buyers.  (Countercompl. ¶ 7.)

CMO claims that it decided to retain Signal Hill based on the terms of the Agreement and other representations Signal Hill allegedly made.  (*See id.*)  CMO paid Signal Hill $50,000 as a retainer fee.  (*Id.* ¶ 6; Agreement § 2(a).)  In addition, "[i]n the event that [CMO] execut[ed] a definitive agreement to consummate a Transaction," it was to pay Signal Hill the greater of either $600,000 or 2.5 percent of the amount paid to CMO in the transaction up to $50 million and 3.0 percent of the amount paid in excess of $50 million, less the amount of the retainer fee. (Agreement § 2(b).)

According to Signal Hill, it discovered on October 24, 2013, that CMO underwent a management buyout backed by a private equity investor, Inflexion. (Compl. ¶ 19; Compl. Ex. B, ECF No. 1-3.) Signal Hill claims the value of the transaction was $64 million and that, under Section 2(b) of the Agreement, CMO was required to pay Signal Hill $1,622,042.84. (Compl. ¶¶ 21, 22.) Accordingly, Signal Hill sent CMO a demand letter for that amount on October 24, 2013. (Compl. ¶ 22; Answer, ECF No. 12, ¶ 22.) CMO refused to pay the amount in the demand letter, and denies that Inflexion paid it $64 million. (Compl. ¶ 23; Answer ¶¶ 21, 23.)

The parties dispute what role Signal Hill had in securing and completing the buyout. Signal Hill claims that it worked "intensively with CMO and on its behalf to identify and pursue a Transaction." (Compl. ¶ 14.) It claims that it contacted Inflexion on behalf of CMO, sent it information about CMO's business and financials, conducted telephone conferences with Inflexion regarding a possible transaction, responded to Inflexion's questions about CMO, and advised CMO in evaluating Inflexion as a potential transaction party. (*Id.* ¶ 15.) According to Signal Hill, Inflexion sent its offer to enter a transaction with CMO directly to Signal Hill on or about July 30, 2013, which Signal Hill then passed along to CMO. (*Id.*) After receiving the offer letter, Signal Hill claims it advised CMO on how to respond and structure any transaction. (*Id.*) In addition, Signal Hill claims to have received offers from other third parties interested in transacting with CMO and to have helped CMO evaluate the offers, decide which to accept, and determine how to structure the transaction. (*Id.* ¶ 16.) According to Signal Hill, CMO ceased all communications on or about September 5, 2013, although CMO denies this. (*Id.* ¶ 17; Answer ¶ 17.)

According to CMO, although Signal Hill promised to "use its best efforts and skill in

3

performing the services" outlined in the contract, (Countercompl. ¶ 9), it did not. First, CMO believes Signal Hill contacted Inflexion *after* CMO brought the company to Signal Hill's attention. (Answer ¶ 15.) Further, CMO claims that, although Signal Hill did find other possible purchasers, they were all unsuitable and did not meet the specific criteria CMO had delineated for suitable candidates. (*Id.* ¶ 16.) CMO claims Signal Hill did not provide sufficient documentation for the "Selling Memo" and that the documentation it did provide had "serious and material errors." (Countercompl. ¶ 11.) In addition, CMO claims Signal Hill did not attend meetings it had scheduled with prospective buyers, participate in negotiations with prospective buyers, provide guidance to CMO about buyers, or find a trade buyer to purchase 100 percent of the business. (*Id.* ¶¶ 12-15.)

Despite their different versions of events, both parties agree that neither formally terminated the Agreement. (Compl. ¶ 18; Countercompl. ¶ 18.)

## ANALYSIS

When ruling on a motion under Rule 12(b)(6) or Rule 12(c), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009) (applying the same standard to a Rule 12(c) motion as to a Rule 12(b)(6) motion). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere

recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. . . . However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (quotations and citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

## I. Motion to Dismiss CMO's Counterclaims

With its answer, CMO filed two counterclaims for negligent misrepresentation and breach of fiduciary duty. It bases these claims on Signal Hill's alleged failure to provide the services outlined in the Agreement and promised to CMO by Signal Hill's agents and representatives.

### A. Negligent Misrepresentation

CMO's negligent misrepresentation claim is barred by Section 7 of the Agreement which releases Signal Hill from all liability except for conduct found to constitute bad faith, willful misconduct, or gross negligence.[1] (Agreement § 7.) CMO has alleged no facts upon which to

---

[1] Section 7 states: "Neither Signal Hill nor any of its affiliates . . . shall be liable to [CMO] or to any other person claiming through [CMO] for any claim, loss, damage, liability, cost or expense suffered by [CMO] or any such other person arising out of or related to Signal Hill's engagement hereunder except for a claim, loss or expense that arises

5

conclude that any misrepresentation as to what services Signal Hill would provide was willful, done in bad faith, or grossly negligent.

"In the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause." *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994).[2]  This general rule does not apply in three situations: 1) where a party intentionally causes harm or engages in "extreme forms of negligence, i.e. reckless, wanton, or gross;" 2) where the contract at issue is the result of "grossly unequal bargaining power;" and 3) where the transaction at issue affects the public interest. *Id.* at 525-26.  CMO does not allege any facts to support a finding that any of the three exceptions apply here.  To the extent CMO attempts to invalidate the clause under the second exception— those transactions involving unequal bargaining power—its conclusory claim in its opposition memorandum that it was a vulnerable party, (Def.'s Opp'n, ECF No. 15, at 6-7), is insufficient.  Both CMO and Signal Hill are sophisticated parties and there are no allegations to demonstrate they entered into anything but a fully-negotiated contract. *See 100 Investment Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 24-25 (Md. 2013) (finding no evidence of disparate bargaining power where there was no evidence the contract was one of adhesion and the parties were sophisticated commercial entities that likely had engaged in similar transactions before).  Because CMO has not alleged anything more than negligence on the part of Signal Hill, and has not alleged any facts upon which to question the validity or enforceability of the exculpatory clause in Section 7 of the Agreement, it cannot bring a claim for negligent misrepresentation

---

primarily out of or is based primarily upon any action or failure to act by Signal Hill . . . that is found in a final judicial determination (or a settlement tantamount thereto) to constitute bad faith, willful misconduct or gross negligence on the part of Signal Hill." (Agreement § 7.)

[2] The Agreement specifies that Maryland law applies to disputes between the parties. (Agreement § 9.)  Neither party disputes the application of Maryland law to the claims at issue here.

against Signal Hill.

The cases on which CMO relies to argue otherwise are inapposite, because they all addressed the question of whether a general integration clause shielded a defendant from liability for fraudulent or negligent misrepresentations made prior to entering into a contract and that were not included in the contract. *See, e.g. Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 n.7 (Md. 1982). It is not the integration clause, or the statute of frauds, that bars CMO's claim here. CMO does not cite any cases in which a court did not enforce an exculpatory clause under similar circumstances. In entering into the agreement, CMO agreed that it would not hold Signal Hill liable for any merely negligent conduct. Its negligent misrepresentation claim, therefore, must be dismissed.[3]

### B. Breach of Fiduciary Duty

For similar reasons, CMO fails to state a claim for breach of fiduciary duty. CMO has not alleged facts supporting a finding of bad faith, willful misconduct, or gross negligence, as required by the Agreement to state a claim against Signal Hill. (Agreement § 7.) In addition, while Maryland law has not been completely clear on this issue, it appears that CMO has failed to state a claim for breach of fiduciary duty because CMO seeks only monetary relief, a remedy not available for an independent breach of fiduciary duty claim. *See Wasserman & Wasserman Goldsten Family LLC v. Kay*, 14 A.3d 1193, 1219 (Md. App. 2011). Where a plaintiff seeks monetary damages, an alleged breach of fiduciary duty may give rise to a cause of action such as breach of contract, negligence, or fraud, but it does not provide an independent cause of action.

---

[3] Even had CMO alleged facts sufficient to overcome the exculpatory clause, the statements on which CMO bases its negligent misrepresentation claim are promises about future events. (*See, e.g.*, Countercompl. ¶ 9 (alleging Signal Hill represented it would use its best efforts to perform the services outlined in the Agreement), ¶ 7 (alleging Signal Hill represented it would find a buyer to purchase 100 percent of the business in three to four months).) Such promissory statements cannot provide a basis for recovery. *See Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 687 (D. Md. 2010) (citing *Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1304 (Md. 1993)).

*Id*. It is only where a plaintiff seeks equitable relief that he may be able to state a separate cause of action for breach of fiduciary duty. *Id.* CMO does not seek equitable relief, nor does this court see any way in which it would.[4] The claim will be dismissed.

## II. Motion for Judgment on the Pleadings

In addition to its motion to dismiss, Signal Hill moves for judgment on the pleadings in its favor, claiming that the Agreement unambiguously requires CMO to pay it the "Transaction Fee" outlined in Section 2(b) of the Agreement because CMO completed a transaction while the Agreement was in effect. It claims that its right to the Transaction Fee is "tied only to the execution of a definitive agreement to consummate a Transaction," and nothing else. (Pl.'s Mem., ECF No. 13-1, at 9.) CMO claims Signal Hill's entitlement to the fee was conditioned on the rendering of the financial advisory and investment banking services outlined in Section 1 of the Agreement and that, because Signal Hill failed to perform those services as required, it cannot recover.

The court finds that the Agreement is, at best, ambiguous as to whether the payment of the Transaction Fee was conditioned on the provision of services delineated in Section 1. Under Maryland law, the unambiguous terms of a contract will govern the parties' rights irrespective of the parties' intent when entering into the contract. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). Where a contract's language is ambiguous, however, the court must consider extrinsic evidence that sheds light on the parties'

---

[4] Even if CMO could bring an independent claim for breach of fiduciary duty, it does not appear to have alleged sufficient facts to establish a fiduciary relationship. It claims Signal Hill was its agent, but the Agreement explicitly disclaims any fiduciary relationship, (Agreement § 10), and it does not appear to give Signal Hill authority to act on behalf of CMO with respect to anything except distributing the Selling Memo, (*id.* §1). *See Integrated Consulting Serv., Inc. v. LDDS Comm., Inc.*, 996 F. Supp. 470, 474 (D. Md. 1998) (citing *Patten v. Bd. of Liquor*, 667 A.2d 940, 947 (Md. App. 1995)) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." (internal quotation marks and citation omitted)).

intentions at the time of execution. *Id.* at 547. "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Id.*

Here, Section 2 of the Agreement states that "[CMO] shall pay Signal Hill *for its services hereunder* a cash fee equal to" the retainer fee *and* the transaction fee. (Agreement § 2 (emphasis added).) The provision reasonably can be read to require that Signal Hill perform its obligations under the Agreement before it is entitled to payment of the Transaction Fee. Because Section 1 is the only section of the Agreement articulating the services Signal Hill was to render, it thus follows that it was those services on which payment was conditioned. If the evidence ultimately demonstrates that this is the appropriate construction of Section 2, then Signal Hill will be required to prove it properly performed under the contract—which CMO vigorously disputes[5]—before it is entitled to recover any unpaid fees. *See Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260-61 (4th Cir. 1981) (noting that Maryland law requires a party to "first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party.").

The cases from the Southern District of New York, on which Signal Hill relies, do not bar such a finding. In those cases, the courts were not stating a general rule that investment banks can collect a transaction fee as long as the requisite transaction has occurred, regardless of its performance under the contract. Instead, the courts were deciding on a summary judgment record that various services which the defendant-client claimed were due prior to payment of any transaction fee were not, in fact, conditions precedent to payment under the language of those

---

[5] Signal Hill characterizes CMO's claims regarding Signal Hill's performance as mere subjective dissatisfaction with its performance. (Pl.'s Reply, ECF No. 18, at 18.) The court, however, understands CMO's claims to be that Signal Hill objectively failed to perform its obligations under the contract. Even if CMO admits that Signal Hill provided some services, (Answer ¶¶ 14-16), that does not mean it admits Signal Hill satisfied its performance requirements under the contract.

specific contracts. *See CIBC World Markets Corp. v. TechTrader, Inc.*, 183 F. Supp. 2d 605, 611 (S.D.N.Y. 2001); *Lazard Freres & Co. v. Crown Sterling Management, Inc.*, 901 F. Supp. 133, 137-38 (S.D.N.Y. 1995); *PaineWebber Inc. v. Campeau Corp.*, 670 F. Supp. 100, 105-06 (S.D.N.Y. 1987). Because the Agreement in this case reasonably could be read to require Signal Hill to perform the services delineated in Section 1 as a condition precedent to payment of the Transaction Fee described in Section 2(b), and because CMO disputes that Signal Hill did in fact perform such services, judgment in its favor is not warranted at this time.[6]

## CONCLUSION

For the reasons stated above, Signal Hill's motion to dismiss will be granted and its motion for judgment on the pleadings will be denied. Further, although CMO has indicated a desire to amend its countercomplaint if the court granted Signal Hill's motion to dismiss, (Def.'s Opp'n at 10), it has offered no proposed amended countercomplaint nor any specific factual allegations that would overcome the deficiencies of its current claims. *See HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) ("A motion to amend should be denied [when] . . . the amendment would be futile.") (internal citation and quotation marks omitted). Accordingly, the dismissal of CMO's counterclaims shall be without leave to amend. A separate order follows.

<u>June 16, 2014</u>     <u>         /s/         </u>
Date     Catherine C. Blake
     United States District Judge

---

[6] In its reply brief, Signal Hill appears to argue that because the Agreement bars CMO from holding Signal Hill responsible for conduct or inaction that is not deemed bad faith, willful misconduct, or gross negligence, (*see* Agreement § 7), it cannot now defend against Signal Hill's breach of contract claim by arguing it was released from performance due to Signal Hill's breach. (*See* Plf.'s Reply at 16.) CMO's position with respect to Signal Hill's breach of contract claim is not that Signal Hill must pay damages, in which case Section 7 of the Agreement may be relevant to determining its right to recovery, as discussed in Part I. Instead, it is only defending against a claim by Signal Hill in which Signal Hill's performance is likely at issue.